**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

**UNITED STATES OF AMERICA,**
      **Plaintiff**                       **Case No. 3:22-cr-00033-OAW**

**v.**

**MICHAEL DIMASSA,**                  **APRIL 13, 2023**
      **Defendant**

## SENTENCING MEMORANDUM ON BEHALF OF MICHAEL DIMASSA

      Michael DiMassa, by and through counsel, respectfully submits this memorandum of law and accompanying documents to assist the Court in determining the appropriate sentence to impose at Mr. DiMassa's upcoming sentencing hearing. These remarks are addressed to what are anticipated to be the main issues and arguments presented to the court at sentencing. For the most part, this Memorandum will be a discussion of individual factors and circumstances that support the sentence that will be requested by the Defendant. We intend to rely upon the collective record in this case, which consists of the very thorough PSR prepared by Senior U.S. Probation Officer Michelle Murphy and the evidence and information presented or available to the Court during the pendency of the case.

      The undersigned anticipates receiving, prior to the sentencing hearing, support letters from friends and family members who have known Mr. DiMassa both before and after the conduct at issue.  Said letters of support will be provided to the Court as a supplemental filing upon receipt.

## I.    PRELIMIARY STATEMENT

      Michael DiMassa, who is presently 32 years old (aged 31 at the time of the offense), is to be sentenced by this Court following his plea of guilty on November 1, 2022, to three

counts of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1349. This plea of guilty represents a first conviction in any court, and therefore a first sentence for Mr. DiMassa.

It is worth noting at the outset that defense counsel does not dispute the facts relating to the Mr. DiMassa's criminal conduct and involvement in the charged offenses as outlined in the PSR. The Court has been provided with an exceptionally thorough report prepared by Probation and a high level of detail regarding the Government's factual allegations, having not only presided over the full trial of Mr. Trasacco, but also having heard nearly three days' worth of testimony by Mr. DiMassa.

During the period of the offense conduct, Mr. DiMassa was employed as an administrative assistant to the City Counsel and was responsible for signing off on invoices requesting payment from the City of West Haven for services rendered to the city. The City of West Haven Financial Director, an unwitting participant, was responsible for authorizing the final approval of the disbursements for payment of invoices for services rendered for the city. The City of West Haven received approximately $1.15 million in Covid Relief Funds, which were deposited into a city account.

The charges, for which Mr. DiMassa has entered a plea of guilty, stem primarily from Mr. DiMassa's role in a fraudulent scheme involving the submission of requests for payment from the City of West Haven for services purportedly provided by Compass Investment Group, LLC; L&H Company; and JIL Sanitation Solutions when no services were actually provided by these entities. The funds disbursed primarily involved Covid-19 relief funds and the services, which were fraudulently claimed to have been provided, related to Covid-19,

such as legal research, lobbying, site work for a Covid-19 clinic, HVAC maintenance at multiple municipal locations, the purchase of personal protective equipment, cleaning services for various municipal and school buildings, etc.

In January 2021, Mr. DiMassa and colleague, John Bernardo, Housing Specialist in the Office of Community Development Administration of West Haven, formed Compass Investment Group, LLC. Both Mr. DiMassa and Mr. Bernardo were listed as principals of the company. The services fraudulently claimed to have been provided by this entity related to services concerning the West Haven Public Health Department. As a result of the fraudulent invoices created by Mr. DiMassa, the City of West Haven issued thirteen checks totaling $636,783.70 to Compass Investment Group, LLC. The lions share of the money obtained through this particular entity ($587,856.45) went to Mr. DiMassa, of which nearly all was used to support Mr. DiMassa's gambling addiction.

Mr. Bernardo introduced Mr. DiMassa to Mr. Trassaco in late 2020, just before Compass Investment Group, LLC was formed. Shortly thereafter, Mr. Trassaco approached Mr. DiMassa with a proposal to have Mr. Trassaco, through his company, L&H Company, and later JIL Sanitation Services, provide fraudulent invoices relating to the purported provision of Covid-19 supplies to West Haven schools. The understanding reached between the parties was that Mr. Trassaco would submit fraudulent invoices and Mr. DiMassa would assist in getting the City of West Haven's approval to disburse payment on the invoices. Mr. Trassaco, after involving himself in the scheme, took advantage of the situation, and of Mr. DiMassa and Mr. Bernardo, by seeking much more money from the City of West Haven, via the fraudulent invoices, than Mr. DiMassa had originally anticipated. Following the initial

3

success of the early disbursements, Mr. Trassaco wanted more, and continued to submit high-priced invoices for services never rendered relating to the City of West Haven, which Mr. DiMassa questioned. Mr. DiMassa recognized that it would be difficult to justify payment of certain invoices submitted by the entities controlled by Mr. Trassaco. Based on a combination of fear of and deception by Mr. Trassaco, Mr. DiMassa, with significant misgivings, assisted Mr. Trassaco in facilitating payment of the fraudulent invoices submitted by the entites controlled by Mr. Trassaco.

Defense counsel is not in any way suggesting that Mr. DiMassa was an unwitting participant in the offense conduct, or that he had not expected compensation for his role in assisting Mr. Trassaco. However, it is important to note that the extent and scope of the fraud was greatly enhanced by Mr. Trassaco and his influence over Mr. DiMassa. After using Mr. DiMassa in order to get the necessary approval for the disbursement of the funds for services that Mr. Trassaco never provided, Mr. Trassaco bilked both Mr. DiMassa and Mr. Bernardo and, of the total $431,982.00 paid to the various entities controlled by Mr. Trassaco, Mr. Trassaco kept all but approximately $20,000.00, which he disbursed to Mr. DiMassa and Mr. Bernardo over time in incremental cash payments.

In addition to the above-described scheme, Mr. DiMassa, with the assistance of his now-wife, Lauren Knox, defrauded the City through a Youth Violence Initiative, which immediately preceded the conduct relating to the Covid relief fund. The funds at issue were not federal funds, but rather regular, City of West Haven or 'state' funds. With regard to the Youth Violence funds, Mr. DiMassa created false invoices for services that, on paper, appeared relevant under the framework of youth violence, but were never actually delivered.

Mr. DiMassa paired the invoices with vouchers for payment. The City of West Haven would then issue checks payable to Ms. Knox, which she would cash and transfer to Mr. DiMassa,

In total, while approximately half of the disbursed funds inured to the benefit of third parties, Mr. DiMassa assisted in facilitating a loss to the City of West Haven in the amount of approximately $1.2 million.

Regardless of any determinations made under guidelines factors, there are, even taking into account the agreed upon downward departures, substantial grounds to conclude that the appropriate sentence for Mr. DiMassa is a non-Guideline sentence. There are factually and legally cognizable reasons for a finding that the charged conduct does not represent Mr. DiMassa in a balanced light. The conduct does not accurately reflect his character, personal circumstances or adequately account for his blameless prior record.

By law, a court is obligated to structure a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing under 18 U.S.C. ¶ 3553(a). Such a sentence is the lowest possible sentence that accounts for all of the relevant factors. Where a district court concludes that a lower sentence will be as effective as a higher sentence, it must impose the lower sentence *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("if a district court were to explicitly conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher."). In considering the nature and circumstances of an offense, and a defendant's prior criminal history, a sentencing judge, must determine a sentence that represents a just punishment, general and specific deterrence, balanced with the goal of rehabilitation, subject to the

precept of parsimony.[1] The emphasis on and importance of these purposes may shift or a particular purpose may apply differently, or even not at all, depending on the kind of sentence under consideration." *Tapia v. United States,* 564 U.S. 319, 326 (2011). In an early post-*Booker* case, the United States Supreme Court observed that where a sentence is unduly punitive, it is at odds with those goals, and may operate "to promote not respect, but derision, of the law." *United States v. Gall*, 552 U.S. 38, 54 (2007).

In this post-*Booker* era the sentencing court has greater latitude. *United States v. Booker,* 543 U.S. 220 (2005).[2] The Court may now engage in what has been described as the art of sentencing rather than the science of sentencing. Id. at 226. See, e.g., *United States v. Bruno,* 789 F.3d 1249, 1254 (11th Cir. 2015) ("The decision about how much weight to assign a particular sentencing factor is 'committed to the sound discretion of the district court.' [Citation omitted]." 1B1.4. In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and

---

1 The district court must give respectful consideration to the guidelines in determining a sufficient sentence, *Gall,* 552 U.S. at 47, but it may not presume that the guideline sentence is the correct one, *Rita v. United States,* 551 U.S. 338 (2007). Rather, it is the statute's parsimony provision, quoted above, which serves as the "overarching" command of§ 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

2 *Booker* made the Sentencing Reform Act of 1984 [SRA] "effectively advisory" by excising the SRA provisions that required judges to sentence withing guideline ranges, directing judges to impose sentences that are "sufficient, but not greater than necessary" to comply with the purposes of sentencing under 18 U.S.C. § 3553(a), and directing judges to "consider" the guidelines and underlying policy statements removing the previously mandated strict formulaic adherence in favor of individualized sentences. 543 U.S. 220, 264 (2005). 2

conduct of the defendant, unless otherwise prohibited by law. A sentencing court is permitted to more freely consider mitigating factors and this Court will be asked to do so in this matter.

## II. GUIDELINES CALCULATION

There is a written plea agreement signed by Mr. DiMassa dated November 1, 2022. Undersigned counsel, Probation, and the Government agree with the advisory guideline calculation and Criminal History Category as determined in the plea agreement, which is reflected in the PSR.

The PSR guidelines analysis begins with a base level of 7. (PSR ¶ 48). A 14-level increase to the base offense level is recommended because the total loss attributable to Mr. DiMassa due to his alleged conduct is more than $550,000.00 but less than 1,500,00.00. (PSR ¶ 48). Because Mr. DiMassa abused a position of public trust in a manner that significantly facilitated the commission of the offense, the PSR recommends a 2-level enhancement. (PSR ¶ 51). Due to Mr. DiMassa having allegedly recruited Mr. Knox and Mr. Bernardo to participate in the offense of Wire Fraud, having received greater financial gain than Mr. Knox and Mr. Bernardo, and Mr. DiMassa's alleged decision-making authority, two levels have been added. (PSR ¶ 52). The PSR recommends a two-level reduction for Mr. DiMassa's acceptance of responsibility; and another agreed one-level decrease based on Mr. DiMassa's acceptance indicated by his plea and having assisted authorities in the investigation or prosecution of Mr. DiMassa's own involvement in the alleged conduct. (PSR ¶¶ 56 & 57). The PSR computation results in a total Offense Level of 22. (PSR ¶ 58). A total Offense Level of 22, and Category I Criminal History, with his score of zero, results in a guideline imprisonment range of forty-one (41) to fifty-one (51) months. According to the

JSIN, using Guideline §2B1.1, and taking into consideration Mr. DiMassa's total offense level of 22 and his criminal history category I, the average length of imprisonment imposed was thirty-three (33) months. It is worth noting that the JSIN platform excludes defendants who have received a §5K.1 substantial assistance departure. (PSR ¶ 107).

As noted in the PSR, "Mr. DiMassa has never served a term of imprisonment. The Court may consider the principle of incremental punishment as a basis for a downward variance." (PSR ¶ 125). "Mr. DiMassa has no prior criminal history...While on bond, he has received mental health treatment…Mr. DiMassa presented as friendly, cooperative, respectful and forthcoming with information. He repeatedly provided statements of remorse and he appears genuine. While on pretrial release, Mr. DiMassa has maintained compliance and is cooperative with the Pretrial Services officer." (PSR ¶¶ 133 & 134). The Court may wish to consider whether imposition of a sentence within the advisory guideline range is more than necessary to accomplish the purposes of sentencing. We respectfully urge the Court to consider this lack of a prior criminal history as a basis for a variance from the applicable guidelines range.

Defendant respectfully maintains that the relatively young man Mr. DiMassa was, and is, both before and since his participation in the charged offense, as well as his otherwise unblemished record prior to the instant offense, warrants a departure and variance from the advisory guideline range. Defendant further maintains that this requested exercise of the Court's authority is consonant with the purposes and goals of post-*Booker* discretionary sentencing.

## III.    PERSONAL BACKGROUND

Mr. DiMassa is a thirty-two-year-old man (aged thirty-one when he became involved in the conduct at issue), born in New Haven, Connecticut, to the (former) marital union of Manuel Rodrigues and Denise DiMassa-Donofrio.  Mr. DiMassa was the only child born to his parents' union.

Mr. DiMassa's parents divorced when he was one year old, and he does not recall his parents maintaining a relationship or living together at all during his lifetime.  Mr. DiMassa was raised by his mother, later with the assistance of his stepfather, Patrick Donofrio, and did not have a meaningful relationship with his biological father.  Mr. DiMassa's last name at birth was 'Rodrigues'; however, due to Mr. DiMassa's biological father's total lack of interest in maintaining a meaningful relationship with Mr. DiMassa, despite Mr. DiMassa's efforts to do so, Mr. DiMassa legally changed his last name to 'DiMassa' at 18 years old, which led to further deterioration of their virtually non-existent relationship.  In 2022, Mr. DiMassa's father, Mr. Rodrigues, died in a motor vehicle accident.

When Mr. DiMassa was two years old, Mr. Donofrio, who would later become Mr. DiMassa's stepfather, moved into the home.  Mr. Donofrio, who had several children from a prior relationship, raised Mr. DiMassa as his own.  Mr. DiMassa views Mr. Donofrio as his father and calls him 'dad'.  The two have a very close relationship and Mr. DiMassa considers his stepfather to be his best friend.  Mr. Donofrio, who is now eighty-nine years old, is approximately twenty years older than Mr. DiMassa's mother; and, consequently, Mr. DiMassa's stepsiblings are significantly older than Mr. DiMassa.  Mr. DiMassa's stepsiblings never resided in the family home. Mr. DiMassa did not have a relationship with them

growing up, nor does he have a strong relationship with them currently.

Mr. DiMassa has faced adversity and fought diligently to succeed all of his life. Throughout childhood, and up to the present day, Mr. DiMassa's parents struggled, and continue to struggle, financially. When Mr. DiMassa was young, his mother worked as a receptionist for a short time but was mostly a homemaker. His stepfather, Mr. Donofrio, worked in food service for Aramark and worked hard to support the family. While Mr. DiMassa was a child, his mother and stepfather tried their best to shield him from their financial difficulties, but they were unable to do so for very long, as they declared bankruptcy when Mr. DiMassa was in elementary school due to significant credit card debt. Both Mr. DiMassa's mother and stepfather were poor money managers.

Mr. DiMassa's mother, who did not work, spent beyond the family's means, often spending the little money the family had on shopping excursions for herself rather than saving or using the money for practical expenditures, such as paying off debt. Mr. DiMassa suspects that she suffered, and continues to suffer from, undiagnosed mental health issues and never fully matured or "grew up" when it came to decision making as an adult, especially regarding money. His stepfather was the breadwinner of the family and his ability to provide for the family on his limited salary was made even more difficult by his gambling habits. Despite the fact that Mr. DiMassa's biological father, Mr. Rodrigues, provided child support for Mr. DiMassa's care, Mr. DiMassa's living circumstances were destitute and the family was constantly burdened with debt.

Mr. DiMassa recalls times when the electricity would be shut off due to unpaid electric bills; going to bed and waking up hungry because the family did not have enough

money for food; taking cold showers because there was no hot water; and regular threats of eviction. Fortunately, because his stepfather worked in the food industry, he was sometimes able to bring food home from work for the family. To this day, Mr. DiMassa's mother and stepfather continue to struggle financially, and they are on a payment plan for overdue rent. Mr. DiMassa grew up keenly aware of the family's financial problems. He often worried that they might lose their housing. He vividly recalls his mother and stepfather arguing about money in his presence; and he will never forget the feeling of embarrassment, shame, and sadness of watching his mother and stepfather beg for money from friends and family so that they could make ends meet.

Even though Mr. DiMassa was young and could not have reasonably been expected to assist with bills, he remembers feeling a sense of guilt over not being able to help more, and feeling like a burden to his mother, stepfather, and biological father. His father never wanted anything to do with him and the only thing he ever did for Mr. DiMassa was pay a marginal amount of child support, which Mr. DiMassa suspects was purely out of obligation rather than love; Mr. Donofrio, his stepfather, had older kids of his own from another marriage, who were more or less financially independent and did not rely on him for support; and his mother had no other children or dependents apart from Mr. DiMassa. Mr. DiMassa often wondered whether his family would have struggled less if they did not have to worry about providing for him.

Despite the significant financial struggles, Mr. DiMassa's mother tried her best to remain upbeat and ensure that Mr. DiMassa felt loved and appreciated. He spent all holidays and special events with his mother and stepfather and recalls that his mother attended all of

his school functions.  Whenever he would return from school, she would always be home waiting for him ready to actively engage and spend time with him.

Mr. DiMassa has lived in Connecticut for his whole life but moved several times in his formative years.  He spent a short time in New Haven before moving to Milford with his mother and stepfather.  The family then moved to East Haven, where he attended both elementary and middle school.  The family ultimately relocated to West Haven and Mr. DiMassa attended and graduated high school there.

While Mr. DiMassa experienced less than ideal living conditions at home, he excelled academically.  School was a welcome distraction from the family's troubles.  When his grandmother passed away, she left a modest sum of money to Mr. DiMassa and Mr. DiMassa's mother.  The money left for Mr. DiMassa was utilized pay for Mr. DiMassa's education at Notre Dame of West Haven.  At Notre Dame, he participated in both track and cross country, graduated with honors, and was named "Notre Dame Man of the Year."  He did not take any time off between high school and college, despite the fact that just after Mr. DiMassa graduated high school, his stepfather, who raised him since he was two years old, suffered his first stroke and became extremely ill, rendering him unable to work or support the family.

Mr. DiMassa felt guilty attending college and spending money on his education while his mother and stepfather struggled, simultaneously, with finances and his stepfather's health issues.  In spite of his difficult personal circumstances, Mr. DiMassa enrolled in Albertus Magnus College in New Haven in August 2009 where he attended as a day student and lived with his parents.  He performed exceptionally well in college and graduated magna cum

laude with a 3.8 cumulative GPA.  He obtained a bachelor's degree in Business Management and graduated (on time) in May 2013.

After graduating college, Mr. DiMassa continued to feel responsible for helping his mother and stepfather stay afloat financially, which he feels his mother exacerbated.  It was not enough that he supported his parents financially; in addition, his mother expected him to take her out to dinner and take her shopping.  He felt that, despite giving his parents everything he could, it was never enough for his mother.  Mr. DiMassa resented the fact that his mother would not contribute any of the modest income that she earned through social security towards paying off her own bills.  By 2016, just three years out of college, Mr. DiMassa filed for bankruptcy due primarily to credit card debt in connection with financially supporting his parents, as well as gambling.

By 2016, at the age of 26, Mr. DiMassa had already been gambling for half of his life.  Mr. DiMassa's stepfather, Mr. Donofrio, was a habitual gambler and introduced Mr. DiMassa to gambling when he was in middle school.  He and his stepfather regularly purchased scratch off lottery tickets together and played the nightly lottery numbers.  This soft introduction to gambling, as Mr. DiMassa understood it, was his stepfather's way of showing him that, despite having very little money, you could make ends meet if you were lucky.  Mr. DiMassa believed, whether it was true or not, that the family's bills were often paid with their lottery winnings, which Mr. DiMassa felt that he was a part of, and it made him feel like the universe was shining down on him and his family.

Apart from the lottery, his stepfather played online poker and had accounts set up, with the assistance of Mr. DiMassa, across various websites, which he eventually allowed

Mr. DiMassa to use, despite the fact that he was under the age of twenty-one. When Mr.

DiMassa reached high school, he became involved in online poker. He used his stepfather's

accounts to gamble online throughout high school and while in college. When he reached the

age of twenty-one, he was legally able to create his own online poker accounts, which he did,

as well as accounts on illegal gambling sites.

Mr. DiMassa was able to compartmentalize his growing gambling addiction well and

keep it more or less under control for a significant period of time. He consistently worked,

earned an income, and was able to support himself and his parents while suffering from a

budding gambling addiction. Prior to his involvement in the charged conduct, Mr. DiMassa

was employed by the City of West Haven in various capacities starting in 2009 when he was

a college student. He worked as an intern for the Mayor's Office from 2009 to 2013;

administrative assistant to the Registrars from 2013 to 2014; revenue clerk in the Tax office

from 2014 to 2016; and ultimately as City Council clerk from 2016 to 2021. While

employed as City Council clerk, in 2021, he became involved in the conduct at issue.

Prior to Mr. DiMassa's involvement in the charged conduct, which began in 2020, he

was a model employee and had an unblemished record in public service. Prior to the conduct

at issue, he never wrongfully conveyed City of West Haven funds to himself or others, nor

has he been accused of doing so. Due to a combination of factors, which include a lifetime

of hardship and financial struggles; prior bankruptcy; the need to support himself and his

parents; an increasingly unmanageable gambling addiction; the recent success of the

acquisition of funds from the Youth Violence initiative; and newly gained, easy access to

approximately $1.15 million of federal Covid-19 relief funds, Mr. DiMassa engaged in the

conduct at issue.

## V.     APPLICATION OF SECTION USC 3553(a) FACTORS MILITATES IN FAVOR OF DOWNWARD DEPARTURE FROM GUIDELINES AND IN FAVOR OF A NON-CUSTODIAL SENTENCE

The statute directs the sentencing judge to consider the following: (1) the offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) 'just punishment' (retribution) (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution. *Rita v. U.S.*, 551 U.S. 338 (2007). Based on these statutory factors, Mr. DiMassa respectfully urges the Court to depart from the guidelines. Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense, but the individual defendant. *Pepper v. United States*, 562 U.S. 476, 494 (2011).

Prior to his participation in the offense, Mr. DiMassa had a pristine criminal record. Subsequent to his guilty plea, Mr. DiMassa has complied with all release restrictions, has worked very hard to secure employment, submitting weekly progress reports to Probation and information regarding jobs for which he has applied.  As noted in the PSR, Mr. DiMassa has provided Probation with documentation of numerous employment positions for which he has applied both online and in-person. (PSR ¶ 92).  Apart from the brief seasonal position of warehouse worker at FedEx in North Haven from November through December 2021, where Mr. DiMassa earned $250 per week, he has been unable to secure employment.  He has used this time where he has been unable to work to provide for his family as a homemaker and

cares for his infant son while being financially supported by his wife (prior to her post-sentencing termination from employment) and mother-in-law, with whom, among other family members, he resides. (PSR ¶¶ 92 & 93).

In addition to his dedication to finding steady employment and caring for his family, Mr. DiMassa is about to become a father for the second time, as his wife is pregnant with their second child. Mr. DiMassa, throughout his life, has been diligent, and determined to persevere through separation and adversity, and is admirably resilient and resolved to continue to be there, and provide for his family. He looks forward to continue to parent and provide for his family and his newborn son and to provide them with the security of the stable home life for which he had longed as a child.

As mentioned *infra*, and as has been brought to the Court's attention in discovery and through multiple days of testimony in the related matter of Mr. Trassaco, Mr. DiMassa suffered from a debilitating gambling addiction at the time of the offense, and his essentially unfettered access to a deep pool of federal funds and total lack of impulse control facilitated his precipitous downward spiral. The amount of money a gambler can waste is only limited by the amount of money that he has or has access to. The concept of, and treacherousness of, gambling addiction can be difficult for people unfamiliar with this affliction to understand. The impact of gambling addiction on those suffering from it, and on the lives of those around them, may be less widely known than that of individuals suffering from drug addiction; although, gambling, for addicts, triggers the same dopamine response as habitual drug users experience.

The latest edition of the American Psychiatric Association's *Diagnostic and Statistical Manual* lists "gambling disorder" in the same category as heroin and opioid addictions. "The criteria for the diagnosis include the need 'to gamble with increasing amounts of money to achieve the desired excitement,' 'repeated unsuccessful attempts to control, cut back or stop gambling,' jeopardizing or losing a 'significant relationship, job or educational or career opportunity due to gambling' and relying on others 'to provide money to relieve desperate financial conditions caused by gambling.' Some studies have found that as many as 19 percent of problem gamblers attempt suicide, the highest rate of any addiction." *See* Gunn, Meghan. *These Are the Real Dangers of the Sports Betting Boom for Young Men*. *Newsweek*. (March 22, 2023). Available at: http://www.newsweek.com. (Accessed: April 13, 2023).

As the Court has consistently recognized, addiction can mitigate a defendant's culpability. The matter of *United States v. Dikiara*, 50 F. Supp. 3d 1029 (E.D. Wis. 2014) is a prime example of a federal district court finding mitigation and imposing a non-Guideline sentence where a defendant, suffering from a similarly debilitating gambling addiction as Mr. DiMassa, stole over a million dollars from her employer over time, which she squandered almost entirely gambling. Ms. Dikiara, without cooperation, and having paid minimal restitution upfront, was sentenced to a 15-month term of imprisonment where the Guidelines range was 41-51 months, based primarily on the severity of her gambling addiction and treatment. The information considered by the Court, quoted below, in determination of the sentence in *Dikiara* is equally applicable in the present case:

In the present case, I first considered the impact of defendant's gambling addiction on her conduct. Defendant did not act out of a desire to harm her employer, nor did she steal in order to finance a lavish lifestyle. Virtually all of the money went to the casino. The records from the casino demonstrated substantial losses, which ate up not just the proceeds of the crime but also defendant and her husband's savings.

As Judge Mark Bennett recently explained, addiction can mitigate a defendant's culpability. "By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences." *United States v. Hendrickson,* No. CR 13–4110, 2014 WL 2600090, at *5 (N.D.Iowa June 11, 2014). Judge Bennett was talking about drug addiction, but as the evidence defendant presented showed, gambling addiction is similar. The American Psychiatric Association recently reclassified pathological gambling from an impulse control disorder to an addiction-related disorder. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM–V") 585 (5th ed.2003); *see also* Ferris Jabr, *How the Brain Gets Addicted to Gambling,* Scientific American, Nov. 5, 2013.

Defendant also cited research that slot machines, her preferred mode of gambling, were more addictive than other forms of gambling. *See* Natasha Dow Schull, *Slot Machines are Designed to Addict,* N.Y. Times, Oct. 10, 2013 ("Studies by a Brown University psychiatrist, Robert Breen, have found that individuals who regularly play slots become addicted three to four times faster (in one year, versus three and a half years) than those who play cards or bet on sports."). The report from counselor Zangl described addictive type behaviors and reactions on defendant's part, including a description of how she was drawn to the machines—the colors and the themes. The report also indicated that she kept thinking she would eventually win enough to pay back the money she had taken. This too was consistent with the literature, including the notion of "chasing one's losses" referenced in the DSM–V. Defendant further presented literature discussing how this kind of addiction can lead from hoping for a big score to cover past losses on to illegal activity. S.H. Dakai, *Compulsive Gambling: An Examination of Compulsive Gambling, Including Pathology, Chemistry Exchange, Similarities to and Differences from Substance Abuse, Gambling Phases, and Assessment Questionnaires,* Journal of Addictive Disorders, 8–9 (2004). Given the impact of her gambling addiction, which was well-supported by the defense materials, a below range term sufficed to provide just punishment.

Second, I took into account defendant's efforts to obtain treatment and rebuild her life after this crime came to light. A defendant suffering from an addiction or compulsion may be less culpable but, without treatment, may present a greater risk of recidivism if the condition is not addressed. In the present case, both the Zangl report and the PSR confirmed that defendant's addiction had been addressed. She regularly attended

GA meetings, participated in individual counseling, and voluntarily banned herself from the casino. The counselor was positive about her prospects, indicating that she had been totally compliant with their treatment plan. Her GA sponsor and the leader of her meeting group also provided positive letters…

Third, I took into account defendant's lack of any prior record, which bore to some extent on culpability but more on the need to protect the public. I saw little such need here, given her age, lack of record, progress in treatment, poor health, and strong family support. Her husband attended GA meetings with her so he could help her avoid problems in the future. I also considered the fact that she had never served any time before. Generally speaking, a lesser sentence will suffice to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend. *See United States v. Qualls,* 373 F.Supp.2d 873, 877 (E.D.Wis.2005)…

Finally, I took into account defendant's acceptance of responsibility, admitting the crime to her employer and then the FBI when confronted. She pleaded guilty to an information and seemed genuinely remorseful. Prior to sentencing she made a restitution payment of $5400, modest compared to what she owed, but nevertheless a positive development. This also demonstrated remorse and a desire to make amends, and suggested that I should take restitution payment into account in determining the sentence. *See* 18 U.S.C. § 3553(a)(7). The term should not be so long that it would destroy her ability to pay back more of what she owed.

These mitigating circumstances did not eliminate the need for punishment—I still found a prison sentence necessary—but they did temper it. Under all the circumstances, I found a sentence of 15 months sufficient but not greater than necessary to satisfy the purposes of sentencing. This provided a significant punishment for a 56 year old first-time offender, while acknowledging the other mitigating factors discussed above.

*United States v. Dikiara*, 50 F. Supp. 3d 1029, 1032–34 (E.D. Wis. 2014).

Mr. DiMassa did not act out of a desire to harm his employer, and he did not steal in order to finance a lavish lifestyle. Mr. DiMassa admittedly did use some of the money to purchase some clothing, meals, drinks and cigars at the Owl Shop (New Haven), but it could not be seriously argued that these indulgences were his primary motivation for engaging in the conduct at issue, or that nearly all of the money was spent for this purpose. Throughout

the relevant time period, he continued to drive the same, modest vehicle that he had owned for years, a 2013 Buick Verano, which is worth approximately $4,200.00 and is still his only vehicle.  Almost all of the funds wrongfully taken were squandered gambling.  Mr. DiMassa, while he knows that his actions hurt his employer, the City of West Haven, the community, and the city's reputation, was never indifferent to the damage he knew that he was causing and had no desire to harm his community or his employer.  He truly loved his community and greatly respected the office by which he had been employed in different capacities for his entire adult life starting at the age of eighteen.

For Mr. DiMassa, gambling was not about winning or losing.  It was about the adrenaline rush of taking a risk for a potentially great reward, and chasing the short-lived thrill of the unknown, potential to hit big and the accompanying dopamine high – a high that became harder and harder to achieve, and was ultimately cut short when the money "won" was lost, sometimes within seconds.  Even just placing a bet in and of itself was a thrill.  Mr. DiMassa would not study odds or probabilities or pick games or place bets where he had a mathematically higher probability of winning, but rather he bet on the long shots and placed "hard" bets.  Mr. DiMassa described these bets as bets most people would avoid, or only place occasionally.  He would make these bets almost every round.  If he was "lucky" he would continue to buy in and "ride" the win.  He would lose track of time, how much money he had on the table, and even where he had placed his chips due to the adrenaline buzz.  He never left on-top, and lost several thousand dollars every time he gambled.  It would not be unusual for Mr. DiMassa to lose $10,000 in a single day, which would have taken him months to earn through his employment.

In addition to casino betting, Mr. DiMassa engaged in illegal sports betting, some of which Mr. Trassaco helped facilitate. When it came to sports betting, Mr. DiMassa first started betting on sports that he felt he knew something about, like baseball and football. However, he would often place those bets a week or so before the actual games, so he was left unfulfilled, and had the compulsion to bet on other sports while waiting for the initial bets to play-out. Due to the empty feeling of waiting on those bets to play-out, he started betting on sports, often obscure ones, that he knew nothing about. He recalls one time betting on a sport, which to this day he is not sure what it was, but believes that it might have been Cricket, in the Middle East. He bet on that particular game because he (incorrectly) believed that the game would start and end quickly and he'd get a fast result. He did not learn until after he had placed the bet that the game of whatever sport it was, likely Cricket, went on for several days. As his gambling addiction worsened, the bets he placed and the types of things that he would gamble on became more absurd, as did the amount of the wagers. For example, he found himself betting on things like what color Gatorade would be poured on the winning coach or how long the national anthem at the super bowl would take for the performer to complete. He would even go as far as searching YouTube for videos of the performer singing the national anthem at a different event and believed that this gave him some sort of edge.

Mr. DiMassa did not just bet on somewhat absurd things or sports that he did not understand, but also engaged in parlay betting on sporting events, which involves making multiple, individual wagers (at least two), or in Mr. DiMassa's case, many more than two, which are all tied together in one bet. The single bet links all of the individual wagers

together and is dependent on all of those wagers winning together.  If one of the wagers loses, all of them are lost.  For example, one could bet that the New York Giants will win by 4 and the Dallas Cowboys will lose by 8, but both things would need to happen in order to win.  Parlay betting is typically frowned upon by professional gamblers, as the more outcomes added increase one's chances of one, and subsequently all, of the wagers being lost, and, relatedly, more money being lost.  This manner of betting was particularly thrilling for Mr. DiMassa.

Subsequent to his arrest his arrest, after he stopped gambling, Mr. DiMassa had the opportunity to watch Uncut Gems, a movie starring Adam Sandler.  Uncut Gems is a story about a fictional character, Howard Ratner (played by Sandler), a Jewish-American jeweler and gambling addict in New York City's Diamond District.  Without spoiling the movie, there is a particularly climactic scene where Sandler's character, in the hole for over $100,000, and at great risk to himself and his family, makes a risky three-outcome parlay bet on a Boston Celtics game.  The movie and the particular scene described, in Mr. DiMassa's view, accurately portrayed, to a surreal extent, the ill-advised behavior of a gambling addict and the real-life consequences of such behavior.  Watching this film as a spectator deeply resonated with Mr. DiMassa.  He very much related to the character getting involved in ridiculous parlay bets and throwing caution to the wind in so doing.  The character of Howard Ratner was an uncannily relatable character for Mr. DiMassa.  There were both responsible and irresponsible sides to Howard Ratner, as well as Mr. DiMassa.  Mr, DiMassa, like Howard Ratner, led an average, regular life, worked a day job, and had family to support; but outside of work and the mundane aspects of life, Mr. DiMassa, like Howard

Ratner, was a high risk, out of control gambler. Witnessing someone that Mr. DiMassa could (unfortunately) relate to so well hit home and assisted him in assessing his conduct and working towards change.

Since terminating his illegal conduct, Mr. DiMassa has confronted his gambling problem head-on and has participated in extensive mental health treatment, for over a year and a half, which includes one-on-one therapy. Simply accepting, genuinely and truly, that he has a gambling addiction took a lot of work and was something that he had never done prior to treatment. Before treatment, he had always been able to rationalize what he was doing as a means to provide for his family, or as only using money "after his obligations were taken care of" – money that he didn't "need" for other things. He has a wonderful relationship with his therapist and will continue to seek help for this problem. He feels, and hopes that, down the road, he will be able to use his experience to help others undergoing similar issues with addiction.

Counsel urges that additional grounds for a non-Guideline sentence are Mr. DiMassa's family's needs and his personal health concerns. The impact on Mr. DiMassa and his immediate family members from the prospect of incarceration, as well as Mr. DiMassa's health concerns, are proper considerations as part of the "history and characteristics" of the defendant. 18 U.S.C. § 3553(a)(1). The additional penalties and hardships for Mr. DiMassa as a result of conviction under these circumstances are relevant to whether the sentence is "just". 18 U.S.C. § 3553(2)(A).

In December 2022, Mr. DiMassa was diagnosed with testicular cancer. He was advised that the best course was to undergo surgery and have the tumor and testicle removed.

Pathology reports indicate that he has a seminoma, which is a slow-growing form of testicular cancer generally found in men in their forties and fifties. While the cancer is in the testes, it may spread to the lymph nodes. Lymph node involvement is either treated with radiotherapy or chemotherapy.  Fortunately, seminomas are sensitive to radiation treatment. After a great deal of consideration, Mr. DiMassa opted to undergo chemotherapy in March 2023.  Mr. DiMassa will need continued monitoring due to the possibility that the cancerous tumor detected was more than a seminoma.  He will need continued monitoring post-chemotherapy, and will need to undergo additional testing six months post-treatment.

Regarding family, Mr. DiMassa has an approximately eleven-month-old son for whom, with the assistance of his wife and mother-in-law, he is the sole caretaker.  His wife, Lauren Knox, will soon be serving a six-month prison term (in relation to the charged offense) and is pregnant with their second child.  Mr. DiMassa has two stepdaughters, Ms. Knox's children, ages sixteen and seventeen, who reside with Mr. DiMassa, his wife, and mother-in-law.  Mr. DiMassa, with the assistance of his wife and mother-in-law, is the sole caretaker for his stepdaughters.  His stepdaughters, like Mr. DiMassa, have grown up without their biological father in their lives and, like Mr. DiMassa, have grown to love, and become dependent, on their stepfather (Mr. DiMassa).  Mr. DiMassa's eleven-month-old son is cared for mainly by Mr. DiMassa, his wife, and his mother-in-law.  As Mr. DiMassa's wife is about to begin to serve her six-month prison sentence, Mr. DiMassa fears, should he be sentenced to a term of imprisonment, that neither parent will be available to care for the children for at least some, yet-to-be-determined amount of time.  Mr. DiMassa feels fear and uncertainty regarding the care of his children and stepchildren in his and his wife's absence.

Prior to his arrest, and public humiliation, Mr. DiMassa enjoyed a an extremely positive reputation throughout the greater West Haven area. His personal successes were founded upon public service and improving the quality of life for the City of West Haven. As noted in the attached articles and documents, Mr. DiMassa's public fall from grace was highly publicized. Mr. DiMassa rapidly went, in the public opinion, from an unblemished, well-regarded public servant to a deplorable scoundrel.

Akin to the resident alien who suffers identifiably more severe penalty for a seemingly identical offense (deportation, denial of certain institutional placement benefits), *U.S. v. Cruz-Ochoa*, 85 F.3d 325 (8th Cir.1996), *U.S. v. Smith*, 27 F.3d 649 (D.C. Cir.1994), the public figure faces penalties well beyond the penalty meted out by the Court and normally experienced in the community by the average defendant. Akin to the lawyer losing his license, Mr. DiMassa faces de facto "debarment" from public service at the state and federal level. In other words, Mr. DiMassa has and will continue to suffer harms and consequences atypical and beyond the norm.

West Haven is a relatively small, tight-knit community where everyone who grew up there knows each other. Many people working and living there as adults grew up together, went to school together and often work together in West Haven. Mr. DiMassa continues to reside in West Haven despite his very public humiliation and vilification.

Since Mr. DiMassa's arrest, he has been the subject of countless news stories and articles excoriating him publicly. Simply searching "Michael Dimassa West Haven CT" on Google yields infinite results regarding Mr. DiMassa's criminal conduct. He even has a Wikipedia page, which discloses that he was charged with stealing COVID-19 relief funds.

The following excerpt, from an article entitled *Michael DiMassa's affairs, gambling habits in spotlight during trial* is representative of the many news articles regarding Mr. DiMassa and the offenses for which he pleaded guilty:

> The personal and professional life of Michael DiMassa, a former Connecticut lawmaker and West Haven city employee, was on full display in federal court on Tuesday as lawyers scrutinized his finances, his gambling habits and his "sexual escapades."
>
> The focus of the trial shifted quickly away from Trasacco's alleged wrongdoing and, instead, delved into the past actions of DiMassa, who pleaded guilty earlier this month to three related conspiracy charges.
>
> Trasacco's defense team's strategy was apparently to impeach DiMassa's character so jurors would have reason to question his motives and credibility while he is on the witness stand.
>
> The defense team avoided asking DiMassa about how he allegedly processed bogus invoices that were submitted by two companies — JIL Sanitation Solutions and L&H Company — which were formed and controlled by Trasacco.
>
> The defense attorneys…spent hours Tuesday afternoon seeking to paint DiMassa, who was elected three times to the state legislature, as a sexual philanderer and gambling addict who was desperate for money.
>
> The lawyers went through the three women one by one, and DiMassa acknowledged having sexual relationships with all three of them.

CTMirror.org, A.B.// (2022) *Michael DiMassa's affairs, gambling habits in spotlight during trial*, *Connecticut Public*. WNPR. Available at: https://www.ctpublic.org/news/2022-11-30/michael-dimassas-affairs-gambling-habits-in-spotlight-during-trial (Accessed: April 12, 2023).

On chat forums, such as Reddit, Mr. DiMassa has been insulted and further embarrassed publicly.  Users have posted things such as, "How much of a scumbag do you need to be to take $600k+ Covid relief funds and lose it gambling? Fuck this guy"; "What a giant piece of shit"; "Hope this scumbag rots in prison"; "Went to high school with the guy,

he was man of the year in his class." *See R/Connecticut - democratic state rep Michael Dimassa charged with stealing 600K+ in Covid relief funds.* (no date) *reddit*. Available at: https://www.reddit.com/r/Connecticut/comments/qdewcs/democratic_state_rep_michael_dim assa_charged_with/ (Accessed: April 13, 2023).

Mr. DiMassa is reminded every day of his regretful actions and his status as an outcast with whom no one wants to associate. Since his arrest nearly two years ago, the only employment that he has been able to obtain, despite applying for jobs on a weekly basis and providing proof to Probation of having done so, was a seasonal job, which lasted a month, working for FedEx for $250.00 a week.

Despite his lamentable, and inexcusable actions, Mr. DiMassa is not a hardened criminal who would, in the future, engage in criminal conduct. He is an intelligent and hardworking individual who has a passion for his community and his family. Mr. DiMassa has the potential, and desire to turn his regretful actions and experiences into positive ones and would be a tremendous asset to the community capable of effectively helping and speaking to individuals regarding the pitfalls of gambling and addiction. He has relevant life experience, not just relating to gambling and addiction, but also in public speaking. Such a service is more relevant than ever now that Connecticut has legalized Online sports betting – something that Mr. DiMassa fears will lead to significant problems for many people, especially twenty-something year-old males, in the not-too-distant future. This fear is also shared by others. The attendant dangers of newly legalized sports betting, particularly for young men, were recently reported on in a Newsweek article titled *These Are the Real Dangers of the Sports Betting Boom for Young Men* (March 22, 2023), cited *infra*. Last year,

the American Gaming Association (AGA) estimated that 45 million Americans would bet

$3.1 billion on the NCAA Division 1 Men's Basketball Tournament.  This year, in 2023, the

AGA estimated that the tournament will attract $15.5 billion in bets from 68 million

Americans, which is over 20 million more people and five times more money than last year.

> Since a Supreme Court ruling opened the door in 2018, legal sports betting has exploded in the U.S., fueled by easy access through online apps and expensive, star-studded ad campaigns for online sportsbooks. Some 36 states have passed laws to allow gambling on sports, another eight are considering it and more than half of American adults—146 million people—now live in a live, legal sports-betting market. The result: record-breaking revenue for the betting companies, a tax windfall for states and, many experts believe, a sharp and troubling rise in the risk of serious gambling problems and addiction. It's a trend the experts believe may rapidly worsen, given what is known about the trajectory of compulsive gambling and the experience of countries that have had legal sports betting in place far longer than the U.S.

> Calls to gambling helplines reflect the growing problem. In 2021 (the most recent year for which data is available), calls to the helpline run by the National Council on Problem Gambling, a gaming industry supported group, rose 43 percent, while texts increased 59 percent and chats jumped 84 percent. That's troubling, but a Newsweek analysis of the available data in every state that has legalized sports gambling since the Supreme Court ruling shows an even more dramatic spike in pleas for help. **In Connecticut, for example, helpline calls jumped 91 percent in the first year after legalization**.

Gunn, Meghan. *These Are the Real Dangers of the Sports Betting Boom for Young Men*. *Newsweek*. (March 22, 2023). Available at: http://www.newsweek.com. (Accessed: April 13, 2023) (emphasis added).

In 2019, in England, a country in which sports betting has been legal for some time,

the National Health Service (NHS) opened its first gambling addiction clinic for children,

which services children as young as 13 years old. *See* Moss, Rachel. *NHS Opens First*

*Gambling Addiction Clinic for Children*. *HuffPost*. (June 24, 2019). Available at:

https://www.huffingtonpost.co.uk/entry/nhs-opens-first-gambling-addiction-clinic-for-

children_uk_5d0ce87be4b07ae90d9c1af2. (Accessed: April 13, 2023).  Mr. DiMassa would be uniquely qualified to assist children, as well as adults, struggling with gambling issues.

Based on Mr. DiMassa's individual characteristics, and personal growth since the commission of the offenses, his status as a true first-time offender with a predictably low risk of recidivism, a guideline sentence is not required to address the goals of sentencing.  Mr. DiMassa, while under pre-trial supervision and monitoring, has been able to demonstrate to the Court the depth and breadth of his ability to move forward and thrive with community supervision.  As a defendant with a Criminal History of 0, there is a strong argument that a non-Guidelines sentence would be a just sentence. [3]

Finally, as an additional factor to consider, based upon circumstances not fully contemplated or addressed in the Guidelines, the Court should also consider whether the continuing effects of the Covid – 19 pandemic warrant and support further non-guideline sentences.  Mr. DiMassa, fortunately, has yet to contract the virus.  Although, his mother-in-law, with whom the family resides, is a Covid-19 survivor who suffers permanent effects of long Covid and has an augmented risk in the event of re-infection.  Many have argued before this Court and others that one day in jail in these times is some, yet to be determined, multiple of a day from years past. The incalculable effect of limitations of family visits, limitations of movement within facilities, the petri dish spread of the virus within facilities can appropriately be considered in deciding upon an appropriate sentence.

---

[3] The May 2004 United States Sentencing Commission study found defendants who were first offenders have lower recidivism rates. See U.S. Sentencing Comm'n, RECIDIVISM AND THE "FIRST OFFENDER" (May 2004) at 13.

**CONCLUSION** Defendant Michael DiMassa respectfully requests a non-Guideline sentence with appropriate conditions.

Respectfully submitted,

THE DEFENDANT
Dated: 4/13/2023                     MICHAEL DIMASSA

By /s/ John R. Gulash
John R. Gulash  #05093
Gulash & Associates
P.O. Box 999
265 Golden Hill Street
Bridgeport, CT 06604
email: JRGulash@Gulashlaw.com

CERTIFICATE OF SERVICE

I hereby certify that on this date above a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ John R. Gulash_____
John R. Gulash ct #0509